Argued and submitted November 8, 2004, judgment of Tax Court
affirmed November 3, 2005

## WILSONVILLE HEIGHTS ASSOC., LTD.,
*Respondent,*

*v.*

## DEPARTMENT OF REVENUE,
*Appellant.*

## (TC 4262; SC S50763)

122 P3d 499

Robert W. Muir, Attorney-in-Charge, Salem, argued the
cause and filed the briefs for appellant. With him on the brief

were Hardy Myers, Attorney General, Mary H. Williams, Solicitor General, and Rochelle Nedeau and Marilyn J. Harbur, Assistant Attorneys General.

Christopher K. Robinson, Lake Oswego, argued the cause for respondent. W. Scott Phinney, Lake Oswego, filed the brief for respondent.

RIGGS, J.

## RIGGS, J.

In this tax case, we decide whether the Oregon Tax Court erred in selecting a particular methodology for determining the assessable value of a low-income housing property for *ad valorem* tax purposes. The Tax Court found in favor of taxpayer, Wilsonville Heights Association, Ltd., when it deducted the value of federal restrictions on taxpayer's low-income housing property from the property's unrestricted value to determine the taxable interest in the property. *Wilsonville Heights Assoc., Ltd. v. Dept. of Rev.*, 17 OTR 139 (2003). The Oregon Department of Revenue (department) appeals to this court pursuant to ORS 305.445.[1] For the reasons that follow, we affirm the decision of the Tax Court.

This court reviews Tax Court decisions for errors or questions of law or lack of substantial evidence. ORS 305.445. The following facts are undisputed. In 1985, taxpayer purchased a parcel of land in Wilsonville, Oregon, and then built on that land a 24-unit low-income housing project pursuant to section 515 of the Federal Housing Act of 1949 (515 Program). 42 USC § 1485 (1985). The 515 Program enables developers to obtain financing for such housing projects under the following terms: (1) the owner contributes five percent of the initial project cost; (2) the federal government provides the remaining costs through a guaranteed, nonrecourse loan; (3) the loan may not be prepaid for 20 years, and the owner may not refinance the project while the government's regulatory agreement is in effect; (4) the agreement limits the rent that owners may charge and limits the tenants to those with incomes in a specified range; (5) all cash flow first must be applied to loan servicing, project maintenance and operating costs, and making required payments to a government-owned reserve account; (6) if sufficient funds remain after making all required expenditures, the owner is entitled

---

[1] ORS 305.445 provides, in part:

"The sole and exclusive remedy for review of any decision or order of the judge of the Tax Court shall be by appeal to the Supreme Court. * * * The scope of the review of either a decision or order of the Tax Court judge shall be limited to errors or questions of law or lack of substantial evidence in the record to support the Tax Court's decision or order."

to an equity dividend payment of no more than eight percent of the owner's initial contribution; (7) the owner's annual income never may exceed that set equity dividend amount; (8) the government provides an interest rate subsidy so that the owner effectively pays only one percent of the loan interest; (9) the owner may transfer the property subject to governmental control of all aspects of the transaction including terms, sale price, and preapproval of the buyer; and (10) any government-approved buyer of the property receives the same loan support and is required to comply with the same program restrictions.

In this case, taxpayer's five percent down payment was $35,500; the government guaranteed a loan for the remaining $674,500 in costs to build the project; the loan interest rate was 10.625 percent and the government paid 9.625 percent of that interest; and the taxpayer was entitled to an annual equity dividend amount of $2,840. Taxpayer received that dividend payment in only two of the first six years of operation. Additionally, during the tax years at issue in this case, there was no ascertainable market for low-income housing properties.[2]

In the tax years 1992-93, 1993-94, and 1994-95, the tax assessor valued taxpayer's property at $706,900, $735,170, and $816,030, respectively. Taxpayer sought a reduction in the real market value assessment of the property for all three of those tax years. In response, the department reassessed the property at $700,000, $728,000, and $757,120, respectively. Taxpayer appealed that assessment to the Tax Court, arguing that the department failed to consider the governmental restrictions on the property when arriving at its real market value computation. Taxpayer alleged that the government's restrictions reduced the real market value of the property to $225,000 for each of the three tax years.

---

[2] The Tax Court noted that changes in the 1980's to governmental regulations affecting low-income housing properties might have contributed to the lack of market for such properties. *Wilsonville Heights Assoc.*, 17 OTR at 142. In any event, neither party submitted evidence of open-market sales of similarly restricted properties, nor do they dispute the absence of an immediate market for such properties.

The Tax Court first concluded that the proper valuation of a federal low-income housing property for *ad valorem* tax purposes must establish the value of the property without restrictions (VPWR) and then reduce that figure by the value of the government's restrictions or interest (VGI). *Wilsonville Heights Assoc.*, 17 OTR at 148. The resulting figure would be the value of the taxable interest (VTI) in that property. *Id.*

The Tax Court then proceeded to apply the formula described. Initially, and in the absence of evidence submitted by the department, the court adopted taxpayer's market sales figures for comparable unrestricted rental properties to determine VPWR during the three tax years at issue. *Id.* at 149.

The Tax Court then turned to the task of determining the value of the government's interest, or VGI, in the project. The court first assumed that the government's interest was "defined and protected by the restrictions on rent, operations, and other matters" and that the government, in essence, "pa[id] for" those restrictions by providing its loan support. *Id.* at 146. Therefore, the court concluded that the value of the government's restrictions would be equal to the sum of the values of the government's interest subsidization plus loan guarantee. *Id.* at 150. The court could determine with reasonable certainty the present value of the government's interest subsidy payments, but found that it could not quantify the market value of the loan guarantee. *Id.* at 150-51. Thus, the court looked to the exchange between the government and taxpayer to obtain a figure for VGI by analogizing to the "presumed equivalency" concept from Internal Revenue Code (IRC) § 1031 exchanges.[3] *Id.* at 151. That is, the court assumed that, in an arm's-length transaction, taxpayer surrendered market rents to obtain the government's

---

[3] Rather than cite the entirety of that code section, we assert here, as did the Tax Court, the more succinct description of the concept provided in *Philadelphia Park Amusement Co. v. U.S.*, 126 F Supp 184, 130 Ct Cl 166 (1954). Put simply, "the value of * * * two properties exchanged in an arm[']s-length transaction are either equal in fact, or are presumed to be equal." *Wilsonville Heights Assoc.*, 17 OTR at 151 (quoting *Philadelphia Park*, 126 F Supp at 189).

loan support; the present value in lost rents may be presumed equivalent to the value of the government's loan support. *Id.* Because the court found taxpayer's figures for the present value of lost rents (PVLR) to be reliable, it then substituted those known values for VGI in each tax year. *Id.* at 151, 153. The court thereafter concluded that the taxable interest for the years 1992-94 were as follows:

| | 1992-93 | 1993-94[4] | 1994-95 |
|---|---|---|---|
| VPWR | $ 825,000 | $ 850,000 | $ 860,000 |
| - VGI (PVLR) | 620,000 | 635,000 | 640,000 |
| VTI or real market value | $ 205,000 | $ 215,000 | $ 220,000 |

*Id.* at 153.

The Tax Court confirmed that its use of the PVLR figure to reduce unrestricted property values in each tax year accurately depicted the market reality of the subject property because, (1) PVLR reflects that an owner's property interest increases as the expiration of the government restrictions draws nearer; and (2) PVLR fluctuates with market rents. *Id.* at 151-52.

In comparing the VTI values derived from the foregoing approach, the Tax Court next utilized the income approach to valuation suggested by both parties and adopted the capitalization rate developed by taxpayer's appraiser. *Id.* at 154, 156, 159. Employing both direct and yield capitalization methods, the court found comparable values to those derived from the "VPWR - VGI = VTI" approach. *Id.* at 154-62. The court issued a judgment consistent with taxpayer's pleadings and set the real market value of taxpayer's property at $225,000 for all three tax years.[5] *Id.* at 163. The present appeal followed.

---

[4] The listed figures correct the 1993-94 VGI and VTI figures set out in the Tax Court's opinion. That court had noted in its opinion that taxpayer's original PVLR/ VGI figures were in error for 1993-94, and that the court would address the issue in supplemental proceedings. *Id.* at 153 n 22. We include the corrected figures here but note that they do not alter the Tax Court's analysis or final determination.

[5] The Tax Court's actual value determinations were lower than those alleged by taxpayer in its pleadings; however, the court determined that it could not issue a judgment with figures below those alleged. *Id.* at 163 (citing *Chart Development Corp. v. Dept. of Rev.*, 16 OTR 9, 14-15 (2001) (to avoid unfair surprise and

■ On appeal, the department argues that the Tax Court erred by (1) determining that the federal restrictions on the subject property "constitute property of the federal government that is exempt from *ad valorem* property taxation"; and (2) failing to include in that formulation the "benefits" of the government's financing agreement. The department asserts that the Tax Court's method for determining the real market value of the property was not authorized by statute, administrative rule, or this court's case law, and that it was not consistent with either of the parties' contentions. The department's briefing focused solely on the Tax Court's "VPWR - VGI = VTI" method.

Taxpayer responds that (1) the Tax Court never held that governmental restrictions constitute property interests that are exempt from *ad valorem* taxation but, rather, that it made a factual determination in accordance with applicable law that such restrictions reduce taxpayer's assessable interest in the property; and (2) the Tax Court correctly determined under the applicable law that the government's financing support does not affect the property's open market value and should not be considered "benefits" that increase the taxable interest in the property. Accordingly, taxpayer argues that the Tax Court made only factual determinations that are beyond the scope of this court's review. ORS 305.445.

We first note that the Tax Court employed multiple methods for valuing the subject property: in addition to its "VPWR - VGI = VTI" approach, it employed two income approaches utilizing both direct and yield capitalization methods. The department assigns error to only the Tax Court's "VPWR - VGI = VTI" approach. We limit our inquiry to that approach.[6]

interference with department's ability to perform statutorily mandated supervisory function, Tax Court limits party to relief sought in pleadings)). Neither party in this case questions that determination on appeal.

[6] In oral argument before this court, the department further contended that the Tax Court had erred by adopting the capitalization rate developed by taxpayer's appraiser, rather than that developed by the department's appraiser, when that court utilized the income approach to valuation suggested by both parties. The department did not assign error to the Tax Court's income approach to valuation, and its written arguments made exclusive reference to the "VPWR - VGI = VTI" methodology. Accordingly, we will not consider the department's argument concerning the appropriate capitalization rate and income approach here. *See* ORAP 5.45 (court's review limited to matters assigned as error).

We agree with taxpayer that the Tax Court did not hold that the government's restrictions constituted a property interest; neither did it hold that the extent of the government's interest was exempt from taxation. The "government interest," as we understand it, is merely a value that the Tax Court assigned to the government's restriction on taxpayer's use of the property. The Tax Court, in turn, reduced the unrestricted property value by that amount. The term and its calculation were simply tools in describing value.

However, this court must decide whether the Tax Court correctly applied the law to the facts in this case. *State v. Barnum*, 333 Or 297, 302, 959 P3d 178 (2002) (when scope of review is for errors of law, the reviewing court decides whether trial court applied legal principles correctly to facts). Accordingly, the fundamental question before this court is whether the Tax Court made its real market value determinations for taxpayer's low-income housing property consistently with applicable statutes, rules, and case law. Within that single inquiry, we will address the department's second assignment of error as well, that is, whether the Tax Court erred by failing to include the government's loan support as a taxable "benefit" to taxpayer. Because the Tax Court's methodology involved reducing, rather than increasing, taxpayer's assessable interest by an amount presumed to be equivalent to the government's loan support, our review of the court's methodology necessarily addresses that second assignment of error. We turn to that inquiry.

ORS 308.205(2) (1991), *amended by* Or Laws 1993, ch 19, § 6; Or Laws 1997, ch 541, § 152,[7] provided:

"(1)   Real market value of all property, real and personal, as the property exists on the date of assessment, means the minimum amount in cash which could reasonably be expected by an informed seller acting without compulsion from an informed buyer acting without compulsion, in an arm's-length transaction during the fiscal year.

"(2)   Real market value in all cases shall be determined by methods and procedures in accordance with rules

---

[7] Although the pertinent provisions remain relatively unchanged, we refer here, and throughout the remainder of this opinion, to the 1991 version of ORS 308.205(2) that is applicable to this case.

adopted by the Department of Revenue and in accordance with the following:

"* * * * *

"(c) If the property has no immediate market value, its real market value is the amount of money that would justly compensate the owner for loss of the property.

"(d) If the property is subject to governmental restriction as to use on the assessment date under applicable law or regulations, real market value shall not be based upon sales that reflect for the property a value that the property would have if the use of the property were not subject to the restriction unless adjustments in value are made reflecting the effect of the restrictions."

Oregon Administrative Rule (OAR) 150-308.205-(A)(2)[8] provides the department's methods and procedures for determining real market value. That rule provides, in part:

"(a) For the valuation of real property all three approaches—sales comparison approach, cost approach, and income approach—must be considered. For a particular property, it may be that all three approaches cannot be applied, however, each must be investigated for its merit in each specific appraisal.

"* * * * *

"(c) In utilizing the sales comparison approach only actual market transactions of property comparable to the subject, or adjusted to be comparable, will be used. All transactions utilized in the sales comparison approach must be verified to ensure they reflect arm[']s-length market transactions. When nontypical market conditions of sale are involved in a transaction (duress, death, foreclosures, interrelated corporations or persons, etc.) the transaction will not be used in the sales comparison approach

---

[8] We refer to the current version of the rules because the department has provided in OAR 150-305.100-(B) that:

"[a]dministrative rules adopted by the department, unless specified otherwise by statute or by rule, shall be applicable for all periods open to examination."

*See also U.S. Bancorp v. Dept. of Rev.*, 337 Or 625, 639, 103 P3d 85 (2004) (department's intent to have rule apply retroactively is clear after examining text and context of rule and OAR 150-305.100-(B)).

unless market-based adjustments can be made for the non-typical market condition.

"(d)  If there are no market transactions of property comparable to the subject, then it is still appropriate to use market value indications derived by the cost, income or stock and debt approaches."

■   The department argues that the Tax Court erred because it failed to determine the value of the whole property pursuant to ORS 308.205(1). The department asserts that, based on that provision, "market value is the amount in cash that reasonably could be expected to be paid by an informed buyer to an informed seller." However, the department's argument ignores additional provisions set forth in ORS 308.205(2) that are relevant to a proper determination of tax-payer's assessable property interest.[9] Particularly, we agree with taxpayer that, consistently with ORS 308.205(2)(d) and this court's case law construing that provision, the Tax Court must determine real market value by making value adjustments "reflecting the effect of the [government's] restrictions" on the subject property. ORS 308.205(2)(d).[10]

In *Bayridge Assoc. Ltd. Partnership v. Dept. of Rev.*, 321 Or 21, 892 P2d 1002 (1995), this court held that a property owner's voluntary participation in the government's low-income housing program constituted a "governmental restriction as to use" that required a reduction in the assessed value of that property pursuant to ORS 308.205(2) (1989), *amended by* Or Laws 1991, ch 459, § 88; Or Laws 1993, ch 19, § 6; Or Laws 1997, ch 541, § 152.[11] In *Bayridge*, that taxpayer's property was subject to restrictions similar to those present in this case: a limitation on rents that owner could charge, a limitation on the pool of tenants to whom

---

[9] In this we agree with the Tax Court's observation that the "department confuses the value of the property with the value of the taxable interest." *Id.* at 153 n 21.

[10] Although the Tax Court expressly stated that paragraph (c) applies in this case (*id.* at 146), the court did not address a pertinent inquiry of that paragraph, *viz.*, whether the figures at issue also would "justly compensate the owner for loss of the property." ORS 308.205(2)(c). However, neither party challenges or argues in favor of the Tax Court's analysis based on the applicability of that provision.

[11] ORS 308.205 (1989) did not differ substantively from ORS 308.205(2) (1991), the provision at issue here.

owner could rent apartments, and terms that were binding on the owner for a period of years. 321 Or at 29-30.

The department fails to distinguish, let alone acknowledge, this court's holding in *Bayridge*. Instead, the department argues that, rather than subtract the value of the government's restrictions from the real market value assessed against taxpayer, the Tax Court merely should determine real market value "in light of those restrictions." That is a distinction that seems to us to make no difference. This court already determined in *Bayridge* that low-income housing restrictions constitute the type of restrictions contemplated by ORS 308.205(2)(d). *Id.* at 31. That statutory provision also expressly requires that property subject to those restrictions must be adjusted by a value "reflecting the effect of the restrictions." ORS 308.205(2)(d). Therefore, the Tax Court correctly determined that taxpayer's assessable interest in the property must reflect the reduction in value caused by the government's restrictions.

The department argues finally that, contrary to ORS 308.205(2), the Tax Court failed to follow the methods and procedures set forth in OAR 150-308.205-(A)(2) for determining real market value. The department argues that the Tax Court's valuation method was contrary to the mandate of paragraph (a), which requires that in "the valuation of real property[, the] sales comparison approach, cost approach, and income approach [ ] must be considered." However, that provision further recognizes that there may be instances in which "all three approaches cannot be applied" and, consequently, the provision requires only that an appraiser "investigate[ ]" those approaches in each specific appraisal. OAR 150-308.205-(A)(2)(a).

Additionally, OAR 150-308.205-(A)(2)(c) provides that, "[i]n utilizing the sales comparison approach[,] only actual market transactions of property comparable * * * or adjusted to be comparable, will be used." That rule gives no specific guidance as to how those adjustments should be made, except that figures "must be verified to ensure they reflect arm[']s-length market transactions." *Id.* OAR 150-308.205-(A)(2)(d) then provides that, in the absence of comparable market transactions, "it is still appropriate to use

market value indications derived by the cost, income or stock and debt approaches."

In this case, the Tax Court first adopted taxpayer's figures for market sales of unrestricted properties. Then, consistently with OAR 150-308.205-(A)(2)(c), the court adjusted those figures "to be comparable" to the subject property when it deducted the value of the governmental restrictions, or its presumed equivalent, from those unrestricted property values. Although the rule requires that such an adjustment be made, the rule does not prescribe any particular method or procedure for developing a value for that adjustment. Accordingly, the Tax Court did not make its property value adjustments *contrary* to any method or procedure prescribed, but in the absence of such specification.

Ultimately, the Tax Court's methodology became an issue of evidence. The court found that department's appraisers employed methods that (1) "consistently refused to consider conventional indicators of value"; *Wilsonville Heights Assoc.*, 17 OTR at 149; (2) utilized only one type of income approach that was "wholly inadequate" (and appears to us to be contrary to the rule); *id.* at 152; (3) generated results that failed to "take into account the decreasing value of the government interest or the impact of termination of the government interest"; *id.* at 153; and (4) "completely ignore[d] whether the value of the [taxpayer]'s interest might change depending on the level of market rents generally or the condition of the property." *Id.*

On the other hand, the Tax Court found that taxpayer's appraiser had utilized "conventional and accepted methods" and had developed more credible market data. *Id.* at 149. The court further relied on taxpayer's expert witness for the present value of lost rent figures when determining the total value that a project owner surrenders to obtain the government's participation. *Id.* at 151 n 17. Based on those factual findings, the Tax Court utilized the more credible evidence within a methodology that the court believed complied with the relevant rules. On the record that the parties created, the department has not shown us how that belief was misplaced.

Finally, and most importantly, the Tax Court did not develop its "VPWR - VGI = VTI" methodology to the exclusion of other prescribed methods or procedures. Instead, under the authority of OAR 150-308.205-(A)(2)(d), the court employed "market value indications derived by * * * the income approach"—a valuation method suggested by both parties. Following that approach, the court further employed both a direct capitalization method and a yield capitalization method in verifying that all the figures that it had obtained were consistent. Thus, as required by OAR 150-308.205-(A)(2)(a), the Tax Court investigated and considered adequately multiple valuation methods and procedures.

In summary, we do not find the department's challenges to the Tax Court's analysis or conclusions in this case to be well-taken. We hold that the Tax Court determined taxpayer's assessable interest in the low-income housing property at issue in accordance with the applicable statutes, rules, and this court's case law.

The judgment of the Tax Court is affirmed.