IN THE OREGON TAX COURT
MAGISTRATE DIVISION
Property Tax

KEY DEVELOPMENT & ASSEST )
MANAGEMENT, INC, dba 403-407 )
PORTWAY, )
  )
        Plaintiff, ) TC-MD 200110R
  )
    v. )
  )
HOOD RIVER COUNTY ASSESSOR, )
  )
        Defendant. ) **DECISION**

Plaintiff appealed Real Property Orders from the Hood River County Board of Property Tax Appeals, mailed March 12, 2020, for the 2019-20 tax year. A trial was held in the courtroom of the Oregon Tax Court. Michael Mangan, an Oregon attorney with the law firm Vorys, Sater, Seymour, and Pease LLP, appeared on behalf of Plaintiff. Jeff Pickhardt (Pickhardt) and Owen Bartels (Bartels), an MAI appraiser with BBG, Inc., testified on behalf of Plaintiff. Chris O'Neill, an Oregon attorney with the law firm Peachey Davies & Myers PC, appeared on behalf of Defendant. Steve Tucker (Tucker), an appraiser for Defendant, testified on behalf of Defendant. Plaintiff's Exhibits 1 to 2 and Defendant's Exhibits A, B, D to H, and J to L were received into evidence.

## I. STATEMENT OF FACTS

During the pre-trial phase of this case, the parties disagreed on the scope of the property under appeal because a portion leased to a tenant was benefiting from an Enterprise Zone Exemption. A mediation was held prior to trial that produced the following stipulation:

> "For purposes of trial at the Magistrate Division the parties agree that as of
> January 1, 2019, the property subject to this appeal includes the real property in
> tax accounts 15725, 21213, and that portion of 21440 owned by Plaintiff and
> further described as follows: Two buildings and supporting land and site

DECISION  TC-MD 200110R                      1

improvements at 403 & 407 Portway, Hood River, Oregon. Ferment Brewing Company occupies the first and second floors of 403 Portway in Hood River. The first floor is industrial space. A portion of the second floor is a kitchen. A portion is retail, and a portion is common area. The third floor is office space but is not leased to Ferment Brewing Company. 407 Portway consists of three floors. The first floor is unfinished industrial production space and storage. The second floor is unfinished. The third floor is office space. Between the two buildings is shared common area."[1]

The subject property is situated in the waterfront zone in the city of Hood River. The area is characterized by outdoor recreation activities, including world class windsurfing, kite boarding, and a proximity to Mt. Hood offering winter sports and hiking. The waterfront zone has been undergoing commercial development after decades of industrial decline. Tourism has become a major economic factor in the area surrounding the subject property. Despite the city's relatively small size and remote location, Bartels observed residential property values in the area are nearly equivalent to Portland, a city with a population more than 75 times Hood River's and the state's economic center, 60 miles to the west.

Pickhardt has been in the real estate development business for 25 years. He began working in Hood River in 1996, developing several buildings in the downtown area with the goal of re-invigorating business there. In 2008, Pickhardt began to work on the waterfront area which had been developed industrially in the 1950s, but in his opinion, had become blighted. Pickhardt negotiated with the Port of Hood River to purchase a dilapidated building, demolish it, and build an upscale new building. Pickhardt testified that the development agreement had multiple parts, and midway through the process, some "downtown interests" petitioned the Port to change the zoning of the subject property during development. The zoning was changed, and a new

---

[1] Despite the stipulation, Plaintiff's appraisal did not include a portion of the subject property occupied by Ferment Brewing. Defendant brought a motion in limine at the start of trial to exclude Bartel's appraisal report. The court's denial of Defendant's motion in limine is further described in the analysis section.

Waterfront Overlay Zone was created. Some of the subject property was zoned industrial with "some bonuses" that allowed up to 1,500 square feet for non-accessory retail space and up to 25 percent could be used for professional office space. Pickhardt testified that the re-zoning forced him to choose between walking away from his sunk development costs or continue construction despite a 25 percent increase in costs. The re-zoning changes also limited occupancy to mostly industrial tenants—restricting the pool of qualified tenants. Pickhardt decided to complete the project on the basis that the project was a long-term investment. Pickhardt testified that in order to maximize the economic viability in light of the zoning overlay, the building had to be constructed with a larger portion of common space than is typical. Pickhardt found a tenant, Ferment Brewing, that met the industrial zoning requirement and also allowed the tenant to use a portion of the building for retail. Pickhardt also has a minority ownership share in Ferment Brewing, which he asserts was necessitated to entice the tenant.

Tucker testified he is a state certified appraiser in Oregon and Washington. He previously worked for the Oregon Department of Revenue managing state property tax appeals. He prepared a retrospective appraisal of the property as of the January 1, 2019, assessment date, which is identified as Exhibit A. Tucker considered the cost, sales comparison, and income approaches for valuing the subject property. He placed primary emphasis on the cost and income approaches because there were no sales of truly comparable properties in the area of the subject property. Tucker relied heavily on actual costs of construction and actual income for the subject properties as the most reliable indicators of value.

Bartels is a commercial real estate appraiser with an MAI designation and manages a BBG Real Estate office in Portland, Oregon. Bartels testified that he prepared two retrospective appraisal reports of the subject property as of January 1, 2019 – one with the entire

improvements and parking lot, which was not submitted into evidence, and one with portions of the subject property leased to Ferment Brewing removed due to its Enterprise Zone Exemption which he submitted as Exhibit 1. During his testimony Bartels corrected his written appraisal, which showed the subject property with 28,779 square feet, to add the Ferment Brewing area. Bartels's updated net rentable area is 34,563 square feet.

Bartels testified that he spoke with several agents and potential tenants in the Hood River area and determined that there were insufficient local sales to base a value upon. He also determined that the Portland metropolitan area was not similar enough to the small community of Hood River to use sales from. Bartels emphasized Pickhardt's testimony that the waterfront overlay zone, with its emphasis on light industrial use and restrictions on retail and professional office space, impacts the value of the subject property. This is so, according to Bartels, because much of the property would require tenants to have both light industrial and retail use within the same tenancy, a level of restriction on acceptable use that results in restricted demand, price, and desirability. Consistent with Pickhardt's testimony, Bartels explained that is why certain incentives, such as partial investment in the lessee's businesses, were required to obtain quality tenants.

According to Bartels, as of the January 1, 2019, assessment date, the property exterior was complete and most of the interior was complete. However, two rental areas were in "shell condition" with no walls, floors, paid or fixtures. Bartels opined with there were costs of $496,797 in remaining tenant improvement work necessary on the property. (Ex 1 at 73.) To determine the subject property's value, Bartels considered the sales comparison, income capitalization, and cost approaches to value.

/ / /

A.    *Sales Comparison Approach*

Bartels selected seven comparable sales to determine the real market value for the subject property – two in Bend, Oregon and five in the Portland Metropolitan area.  Bartels testified that because of the mixed-use nature of the property, it was difficult to find a good single sale and thus he did not give this approach much weight.  Bartels used portions of property sales with the correct property type (industrial, restaurant, retail, and office) to use as comparables.  After adjusting for the interest conveyed, market conditions, location, size, year built, condition, quality, parking, and zoning, Bartels found the comparables had an indicated value of $300 per square foot.  (Ex 1 at 74.)  Using a corrected figure of net rentable area of 34,563 square feet, Bartels testified that he found the indicated stabilized value to be $10,368,900.  Bartels deducted for the cost to bring two units into rentable condition and concluded a rounded value of $9,870,000.

Tucker testified that due to a lack of data, he did not perform a traditional sales comparison approach except for the purpose of identifying capitalization rates.  Tucker selected nine sales from Bend, Portland, and Beaverton.  Despite his assertion the sales comparison approach was not developed, his report opined at that the value of comparables was $318.75 per square foot, which when applied to a gross building area of 47,526 square feet,[2] resulted in a rounded value of $15,100,000.

/ / /

/ / /

_____

[2] Tucker did not explicitly explain why he used the 47,526 square feet total area of improvements figure rather than the rentable area of 34,563 square feet.  However, Tucker did note in his report that "[a]pproximately 27 percent of the improvements are common area[,]" whereas "a typical office building has approximately 10-12 percent common area. Retail and industrial developments typically have far less common area as a percentage of total area. Much of the common area is an amenity to the rentable area."  (Exhibit A at 39.)

B.      *Income Capitalization Approach*

To estimate the potential income of the subject property, Bartels searched for comparable rentals with the square footage of the types of uses allowed in the building. He did not use the actual roll values for the subject property because of the business relationships with some of the tenants.

Bartels concluded that the potential rental income based on comparable properties was $715,066.[3] Bartels added expense reimbursement (pass-through income) of $216,323.[4] From that figure Bartels deducted five percent for vacancy and collection loss, $246,323 in expenses yielding a net operating income of $638,496. Bartels selected a capitalization rate of 6.25 percent based upon an identified range of 6.00 – 6.50% found from a market selection of six properties.[5] The 6.25% rate yielded a value of $10,215,931 before deductions for the two tenant spaces needing improvement. Bartels testified to a rounded value of $9,720,000 for the subject property using the income capitalization approach.

Tucker developed his income approach by using actual building rents with the exception of vacant space, where he used comparable leases located in Portland, Oak Grove, and Hillsboro. (Ex A at 74.) Tucker selected comparable manufacturing space on the first floor averaging $18 per square feet, second floor restaurant space at $32.04 per square foot, and third floor office space at $26 to $27 per square foot, with an average of $23.44 per square foot. Tucker used a

---

[3] In his testimony, Bartels updated the $615,238 conclusion found in Exhibit 1, page 86.

[4] In his report, Bartels noted that the landlord does not recover expenses on the common areas and public spaces. (Exhibit 1 at 87.)

[5] The capitalization rate is a tool that helps estimate the relationship between a property's net income and its sale price. *Department of Revenue v Butte Creek Associates*, 19 OTR 1 (2006). The capitalization rate is typically derived from the market by dividing the property's net income by the sale price. *Pfanmuller v Dept. of Rev.*, 11 OTR 225 (1989).

blanket approach to value per each floor: the first floor he valued as industrial space, the second floor he valued as restaurant space, and the third floor was treated as office space. Tucker found the potential gross rent of $894,375 per year. He also found reimbursable expenses for pro-rate share in the amount of $5.04 per foot. However, Tucker found that an average reimbursable expenses for similar type buildings would be near $7.00 per square foot and thus increased the potential gross income to $1,079,500 per year. From that figure, Tucker deducted five percent for vacancy and three percent for non-reimbursable expenses, yielding a net operating income figure of $805,174. (Ex A at 89.)

In determining an appropriate capitalization rate, Tucker considered five comparable sales with rates ranging from 5.22 to 6.22 percent. Three listings were in Hood River, with asking prices indicating capitalization rates from 4.5 to 6.5 percent. He also used national brokerage market reports for commercial properties in the Portland area, which averaged 6.0 to 6.25 percent. Considering the newness of the subject property and its prime location, Tucker found the appropriate capitalization rate to be 5.5 percent. Dividing the net operating income by the capitalization rate yields a rounded value for the subject property of $14,600,000.

C.    *Cost Approach*

Bartels testified that although the property is almost brand new, the cost approach does not provide a reliable value of the subject property because changes required during the building process were significant enough to increase the cost beyond the value of the building. Bartels opined that a potential investor would consider the cost of the building but would not rely on that figure in establishing a hypothetical purchase price.

Bartel's report used the cost approach to value tax account 21213, a 1-acre parking lot. Bartels was unable to locate any parking lots or comparable vacant industrial lots in close

proximity to the subject property. Thus, he expanded his search to include all of Hood River and Deschutes Counties, cities along Interstate 84, and southern Washington. (Ex 1 at 95.) Bartels selected 11 industrial land sales and found an indicated raw land value of $6.50 per square foot equating to an indicated rounded value of $280,000. (Ex 1 at 98.) Bartels then adjusted for the 108 parking stalls on the lot using Marshal Valuation Service and arrived at a total value of $520,000 for tax account 21213.

Tucker testified that he primarily relied on the cost approach because the building was newly built. This approach in his view is the best value that always returns a true fee simple value. Additionally, Tucker used actual costs as provided by Plaintiff because he felt those would be more accurate than estimating costs to build using the Marshall & Swift valuation program. Based on those costs, Tucker valued the improvements at $12.4 million. He then added the land value of $1,412,464 to arrive at a value for the subject property of $13.8 million. (Ex A at 57-61.)

D.     *Reconciliation*

Reconciling his sales comparison and income approach, Bartels opined the value of the overall property to be $9,750,000, with $9,230,000 allocated to tax account 15725 and $520,000 to tax account 21213. Tucker reconciled the results placing primary reliance on the cost and income approaches. Tucker then deducted $100,000 for the cost to bring the two unfinished rental spaces to completion.[6] Ultimately, Tucker opined the value of the subject property to be

/ / /

---

[6] Tucker's estimation of the cost to bring the two unfinished rental spaces to completion was based on an evaluation of the "building permits issued indicating there was approximately $150,000 of unfinished work on 11-30-2018." (Ex A at 93.) Tucker further noted that based upon the commencement of the tenancy for the spaces commencing February 1, 2019, "it is likely that a fairly large portion of the remaining $150,000 in tenant improvements was finished by January 1, 2019" based upon the item actual cost detail information provided by Plaintiff.

$14,100,000. He split the concluded value into an allocation of $13,200,350 for tax account 15725 and $999,650 for tax account 21213.

## II. ANALYSIS

At issue is the real market value of a relatively new building in an emerging waterfront area in Hood River, Oregon. As the party seeking affirmative relief, Plaintiff bears the burden of proof by a preponderance of the evidence. ORS 305.427.[7] A "[p]reponderance of the evidence means the greater weight of evidence, the more convincing evidence." *Feves v. Dept. of Rev.*, 4 OTR 302, 312 (1971). Because real market value is the issue, "the court has jurisdiction to determine the real market value or correct valuation on the basis of the evidence before the court, without regard to the values pleaded by the parties." ORS 305.412. Valuation is guided by appraisal principles, but the determination of the appropriate methodology in any given case is a question of fact. *Powell Street I, LLC v. Multnomah County Assessor*, 365 Or 245, 260-61, 445 P3d 297 (2019).

A.      *Major issues affecting analysis of the case*

1.      *Errors in Plaintiff's appraisal report*

Defendant brought a motion in limine arguing that the court should not consider Plaintiff's appraisal because it was based on an incorrect square footage of the subject property as it did not include portions that were subject to an Enterprise Zone Exemption. The court overruled Defendant's objection and opted to hear testimony correcting the appraisal report. Despite the ruling allowing the evidence, the court does consider the error perplexing in light of the court's admonition at prior case management conferences that the appeal was about the improvements for the entire subject property and not about the tax exemption. Further, the court

---

[7] The court's references to the Oregon Revised Statutes (ORS) are to 2019.

took the uncommon step of ordering the case to mediation to establish the scope of the property on appeal. In reviewing Bartels' demeanor and explanation of the error, the court is persuaded that it was the result of him being given an inaccurate assignment rather than appraiser error. The court finds that Bartels sufficiently explained and corrected the errors in his appraisal report during trial.

2. *Zoning change*

Pickhardt and Bartels testified that zoning changes made during development of the subject property substantially increased the cost of construction. They further testified that those zoning limitations impacted layout, rentability, and the type of tenant that could meet those requirements. Defendant argued that the zoning changes were not out of the ordinary, and did not substantially impact either the cost of construction or the rentability of the subject property. In considering the evidence as a whole, the court is persuaded by Plaintiff's witnesses that the zoning changes made during the development process substantially impacted both the cost of construction and the rentability of the building. Both parties noted the unusually large proportion of common space in the subject property. Plaintiff's witnesses persuasively testified that this was a direct result of the zoning limitations.

B. *Approaches to Valuation*

1. *Cost approach*

Plaintiff considered and rejected the cost approach for tax account 15725 because of the zoning change issues cited above. Defendant's reliance on the cost approach is misplaced because it would yield a reproduction cost, which includes the additional costs Plaintiff had to expend as a result of the zoning changes, and not a replacement cost of the actual building that potential buyers would use as a comparison. While the cost approach does remove the potential

problem of the value-in-use of the business from the calculus, the court agrees with Plaintiff that market participants would not rely on this approach when evaluating a purchase price for a building with significant increased costs due to zoning changes made during development of the subject property.

For tax account 21213, Plaintiff offered a reasonable explanation of how it determined the value of the parking lot using the cost approach. Defendant did not adequately explain its valuation for that property at trial.

2. *Income approach*

Both parties used the direct capitalization method that starts with selecting appropriate market lease comparables, determining the gross operating income, subtracting certain hypothetical expenses, and dividing the net operating income by an overall capitalization rate. *McGrath's Public Fish House v. Marion County Assessor*, TC-MD 200092R, 2020 WL 1165028 at *5 (Or Tax M Div, Apr 20, 2022).

Plaintiff selected properties and allocated a price per square foot corresponding to the types of uses allowable under the zoning in effect. Defendant primarily relied on actual rents received by Plaintiffs. In considering both approaches the court finds Plaintiff's approach more persuasive. The court finds Defendant's valuation approach improperly includes intangible value based upon Plaintiff's management skill and strategic investment in some its tenants' businesses. Defendant's approach measures the "value in use" of the subject property rather the value of a hypothetical sale. "Oregon law requires the use of market value, not 'value in use.'" *Ellison v. Dept. of Rev.*, 362 Or 148, 169, 404 P3d 933 (2017), *opinion adh'd to as modified on recons,* 362 Or 527, 412 P3d 201 (2018). Thus, this method would be representative only of the current user's value-in-use but would not reflect the market's valuation for a hypothetical user.

3. *Sales comparison approach*

The sales comparison approach "may be used to value improved properties, vacant land, or land being considered as though vacant." *Chambers Management Corp v. Lane County Assessor*, TC-MD 060354D, 2007 WL 1068455 at *3 (Or Tax M Div, Apr 3, 2007) (citations omitted). "The court looks for arm's length sale transactions of property similar in size, quality, age and location" to the property. *Richardson v Clackamas County Assessor*, TC-MD 020869D, 2003 WL 21263620 at *3 ()r tax M Div, Mar 26, 2003). "In utilizing the sales comparison approach, only actual market transactions of property comparable to the subject, or adjusted to be comparable, will be used. All transactions utilized in the sales comparison approach must be verified to ensure they reflect arms-length transactions." OAR 150-308-0240(2)(c). Although Plaintiff developed a sales comparison approach, Bartels did not give much weight to the value because of a lack of local sales of similar properties. Defendant did not rely on the sales comparison approach for the same reason. The court finds that the lack of contemporaneous sales of similar property in the area prevents the sales comparison approach from being reliable as a valuation measure for the subject property.

III. CONCLUSION

After careful consideration of the evidence, the court finds the value of the subject property to be $9,750,000 as of the January 1, 2019, assessment date. Now, therefore,

/ / /

/ / /

/ / /

/ / /

/ / /

IT IS THE DECISION OF THIS COURT that Plaintiff's appeal is granted. The subject property's overall real market value for the 2019-20 tax year is $9,750,000, allocated as follows: $9,230,000 for tax account 15725 and $520,000 for tax account 21213.

Dated this ___ day of March 2024.

RICHARD DAVIS
MAGISTRATE

*If you want to appeal this Decision, file a complaint in the Regular Division of the Oregon Tax Court, by <u>mailing</u> to: 1163 State Street, Salem, OR 97301-2563; or by <u>hand delivery</u> to: Fourth Floor, 1241 State Street, Salem, OR.*

*Your complaint must be submitted within <u>60</u> days after the date of this Decision or this Decision cannot be changed. TCR-MD 19 B.*

*This document was signed by Magistrate Richard Davis and entered on March 22, 2024.*